NELSON, J.
*966 **709 This case requires us to decide whether the definition of "worker" in the Workers' Compensation Law encompasses a claimant injured during a preemployment drive test that consisted of an actual delivery for an employer. To qualify for workers' compensation, a claimant must be a "worker." ORS 656.027. ORS 656.005(30) defines "worker," in part, as a person "who engages to furnish services for a remuneration." Claimant, a commercial truck driver, was sent on a supervised delivery by and for employer as a preemployment drive test. He was injured when he fell from employer's truck. The Workers' Compensation Board (the board) denied claimant coverage, concluding that he did not qualify as a worker at the time of the injury. The Court of Appeals reversed, holding that Oregon's minimum wage laws would have entitled claimant to be paid for the delivery and that, therefore, he was a worker within the meaning of the workers' compensation statute. Gadalean v. SAIF , 286 Or. App. 227, 398 P.3d 503 (2017). For the reasons that follow, we conclude that the Court of Appeals erred, and we affirm the board's denial of coverage.
FACTS
We take the historical facts from the board's findings set out in its order. Those include the earlier findings of an administrative law judge (ALJ), which the board adopted along with its own factual summary.
In May 2014, claimant responded to employer's job advertisement for a truck driver position. He applied for the position by email and submitted his resume online. He also completed a drug screen and provided employer with copies of his current Commercial Driver's License, medical card, social security card, and DMV records, along with the results of the drug screen.
Soon thereafter, employer's owner, Van Hyning, had claimant come to his office for an interview, where they discussed his application and the requirements of the job. Claimant was scheduled to take a mandatory U.S. Department of Transportation (DOT) pre-employment driving test.
**710 The board found that no offer of employment was made during that meeting.
On June 4, 2014, claimant met with Hanson, one of employer's truck drivers, for the driving test. Claimant drove one of employer's trucks, with Hanson as a passenger, to a designated delivery location. While disconnecting hoses from the trailer at that location, claimant fell four or five feet from the truck to the ground. He landed on his left hip and experienced significant pain. Claimant's injury rendered him unable to drive the truck, and Hanson drove to the next stop, where they picked up an empty container before returning to employer's premises.
Van Hyning did not ask claimant to come back to finish the driving test. Claimant did not fill out any employment tax forms. He did not receive any written offer of employment.
After the accident, claimant sought medical treatment for his injury and was diagnosed with left hip strain. On June 10, 2014, claimant filed an injury claim with SAIF, alleging that he had injured himself on June 4, while working for employer as a truck driver. Claimant also submitted Workers' Compensation Form 801 to employer. On that form, under "date worker hired," employer wrote "preemployment driving test," because claimant had not been hired yet and the driving *967 test and evaluative process had been unpaid work.
As part of SAIF's investigation of his claim, claimant told a SAIF investigator that he had understood that Van Hyning had "want[ed] to evaluate me," which was why he had sent claimant with another driver. Claimant did not know whether June 4 had been considered a training day or a preemployment evaluation day. As he understood it, the agreement was that Van Hyning would assess how he performed on June 4, and, if he passed, he would "continue working." Claimant also told the investigator that he had not received any written offer of employment nor filled out any employment tax form.
SAIF denied compensability of the claim, asserting that claimant had not been a subject worker at the time of **711 the injury because he had not met the definition of "worker" in ORS 656.005(30). On claimant's request, an ALJ later conducted a hearing, at which he considered the investigator's report and the testimony of three witnesses: claimant, Van Hyning, and Hanson.
Claimant testified that, when he first met with Van Hyning, he was given a job description and a schedule, and told what his pay would be. Claimant further asserted that Van Hyning had told him that he had the job before the safe driving test, did not say that claimant was being evaluated that day, and had agreed to pay claimant 25 percent of the gross profit from the delivery claimant was to complete.
The investigator's report summarized claimant's understanding somewhat differently:
"Van [H]yning 'wants to evaluate me[,]' which was the reason he sent [claimant] with another driver. [Claimant] did not receive a written job offer. Van [H]yning did not tell [claimant] he got the job just [he] wanted [claimant] to drive with another driver. The point was not to offer a job but to evaluate how good [claimant] can do the job. [Claimant] could not define June 4, as a training day or evaluation day. [Claimant] said that Van [H]yning was going to send [him] to work for one day to see how he does and if [claimant] did a good job he would continue working. On June 4, 2014, [claimant] said he drove the truck to a warehouse in Clackamas. [Claimant] did not fill [out] any employment tax forms. He did not receive any written job offer."
(Alterations in original.)
Van Hyning testified that he could not remember what he specifically had told claimant in their meeting prior to the drive, but that he had not hired claimant. He explained that it was his usual practice to tell applicants that they would be required to take an unpaid safe driving test as part of the evaluation process. According to Van Hyning, a safe driving test was required by DOT, and every driver hired by employer had to take and pass the test.[1] The **712 employer's test involved putting the individual in a regular delivery scenario and having the prospective employee drive in real-world situations with an experienced driver. Individuals participating in the safe driving test were not placed on any insurance. For individuals who passed the test, Van Hyning would meet with them again to discuss the job in more detail and see if they were still interested. Van Hyning testified that, at that point in time, he would have told claimant that he had been hired and required him to fill out tax forms.[2]
Van Hyning also explained that, if claimant had been an employee when he was injured on the delivery, he would have been paid. Van Hyning did not think that the employer had received any benefit from claimant's participation in the delivery because Hanson, who had been paid for his work that day, would have been driving the route even if claimant had not been there.
During Hanson's testimony, he estimated that claimant had driven about 30 miles before he was injured. Hanson also testified that he took a safe driving test before he was hired, and he did not think a driver could be *968 evaluated without doing the "road test." He also verified that every potential employee of employer had to take the road test prior to employment.
The ALJ affirmed SAIF's denial of the claim after determining that, at the time of his injury, claimant had not been hired and had not received any kind of remuneration or promise of future remuneration, and was therefore not a subject worker. In making that determination, the ALJ discredited claimant's testimony that he had been told that he would be paid twenty-five percent of the gross profit for the delivery. In that regard, the ALJ specifically stated that claimant's testimony "at [the] hearing was at odds with his prior *** statement" and "was vague or contradictory."
By contrast, the ALJ found Van Hyning and Hanson credible. The ALJ found that "Van Hyning [had] asked **713 claimant to engage in an unpaid driving test" and that claimant had understood that "there was no employment agreement at that time or promise of future remuneration." The ALJ also determined that "Van Hyning emphasized to claimant that the driving test was required by DOT, was unpaid, and he would not even consider hiring claimant until he successfully passed the driving test."
Claimant sought review of the ALJ's order by the board. The board affirmed on review and on reconsideration, adopting the ALJ's findings of fact. One member dissented, explaining that she considered employer's receipt of claimant's services without remuneration unjust and would, therefore, infer the presence of an implied contract establishing claimant as a subject worker. She noted that, although not controlling, the minimum wage statutes supported finding an implied-in-law contract.
Claimant filed a petition for judicial review in the Court of Appeals. On review, claimant did not take issue with any of the board's findings of fact. Instead, he contended that the board should have looked beyond the workers' compensation statutes to the minimum wage law to determine applicability of benefits.
The Court of Appeals reversed the board, concluding that claimant indeed had qualified as a worker at the time of his injury because he had been "put to work" and thus was entitled to receive the minimum wage for the delivery he made. The court reasoned that, under ORS 656.005(30), a "worker" is someone who enters into a contract to work for pay. The court noted that, (1) in the absence of specific statutory exemptions, under the minimum wage statute, ORS 653.025, a person must be paid a wage for work; and (2) what claimant did for employer was "work" as a matter of law, regardless of whether employer had the subjective or even primary purpose of evaluating him in anticipation of permanent employment. Gadalean , 286 Or. App. at 229-30, 398 P.3d 503.
The Court of Appeals then determined that claimant had furnished services to employer requiring remuneration because employer had conceded that claimant had performed the activities of a regularly employed driver, that **714 the delivery had been performed in the ordinary course of employer's business, and that employer probably had been compensated for the delivery. The court also indicated that employer had received the benefit of being able to evaluate claimant's driving without disrupting its ordinary delivery schedule or expending resources to administer a separate driving test. Id. at 231, 398 P.3d 503.
SAIF petitioned for review. We allowed review to address the proper interpretation of the definition of "worker" set out in ORS 656.005(30), specifically, the meaning of the phrase "engages to furnish services for a remuneration."
ANALYSIS
In this case, neither claimant nor petitioner challenged the board's factual findings in its final order. As a result, those findings are binding for the purposes of our review. Multnomah County Sheriff's Office v. Edwards , 361 Or. 761, 776, 399 P.3d 969 (2017). Thus, we review only the legal question of whether claimant was a "worker" under the board's factual findings. See ORS 183.482(8)(a) (court reviews legal conclusions for errors of law). Under ORS 656.005(30), a "worker" is "any *969 person *** who engages to furnish services for a remuneration."
SAIF argues that the Court of Appeals erred in concluding that an agreement for remuneration existed between claimant and employer as a matter of law based on the minimum wage statute. SAIF reasons that, for claimant to have been a "worker" for workers' compensation purposes, ORS 656.005(30) requires a contract with an express or implied agreement between the employer and a person "who engages to furnish services for a remuneration." It argues that the Court of Appeals used the minimum wage law to find a contract implied at law, which it contends was improper because the Workers' Compensation Law is a creature of statute and, thus, common-law remedies cannot be substituted for its requirements.
Claimant responds, relying on the Court of Appeals reasoning in Amos v. SAIF , 72 Or. App. 145, 694 P.2d 998 (1985), that we should look to minimum wage law to determine whether he was a "worker" under the Workers'
**715 Compensation Law. Claimant argues that the Court of Appeals correctly chose to apply Oregon minimum wage law to conclude that the definition of "worker" had been satisfied because claimant had agreed to perform work and was entitled to remuneration as a matter of law. He contends that the requirement "for a remuneration," ORS 656.005(30), can be implied when required by law and that, as a matter of public policy, the law mandates that someone who is put to work be treated as a worker under both the minimum wage law and the Workers' Compensation Law.
Claimant's reliance on Amos , however, is misplaced: even if we were to endorse the Court of Appeals' reasoning in Amos , we disagree that it applies here. In Amos , the Court of Appeals concluded that it was appropriate for the board to apply Oregon's paternity laws to determine whether a claimant was entitled to benefits as an "illegitimate child," in the absence of a statutory definition of illegitimacy under the Workers' Compensation Law. 72 Or. App. at 149, 694 P.2d 998. In this case, by contrast, the legislature has defined "worker" for the purposes of the Workers' Compensation Law. The minimum wage law would not be helpful in determining any aspect of the definition of "worker"; indeed, under claimant's proposed application, the minimum wage law would substitute for large parts of the statutory definition of "worker." Neither the board nor the courts may substitute express statutory requirements with incompatible provisions from other statutes or common law. See generally ORS 174.010 (when construing statutes, courts may neither insert what has been omitted nor omit what has been inserted); see also ORS 656.003 ("Except where the context otherwise requires, the definitions given in this chapter govern its construction.").
We are thus confronted with an issue of statutory construction to determine the legislature's intended meaning of ORS 656.005(30) and, if employer had claimant perform an activity for which minimum wage law requires a wage, whether claimant therefore had "engage[d] to furnish services for a remuneration." We resolve that issue in accordance with the framework for statutory interpretation described in PGE v. Bureau of Labor and Industries , 317 Or. 606, 610-12, 859 P.2d 1143 (1993), and **716 State v. Gaines , 346 Or. 160, 171-73, 206 P.3d 1042 (2009), which require us to examine the text of the statute in context, together with helpful legislative history.
Turning first to the text of ORS 656.005(30), it provides, in part:
" 'Worker' means any person, including a minor whether lawfully or unlawfully employed, who engages to furnish services for a remuneration, subject to the direction and control of an employer ***."
That definition, in turn, uses other words that are not defined. We presume that the legislature intended those words to mean what they mean in ordinary usage. State v. Dickerson , 356 Or. 822, 829, 345 P.3d 447 (2015). "Engage" is used in ORS 656.005(30) as an intransitive verb. As such, the most relevant definition for "engage" is "to enter into or take on an obligation." Webster's Third New Int'l Dictionary 751 (unabridged ed. 2002). The legislature, however, did not define a worker solely as one who takes on *970 an obligation. It further chose to specify what that obligation must entail-that the claimant will "furnish services for a remuneration, subject to the direction and control of an employer."
The parties agree that an obligation to "furnish services" for a "remuneration" are independent elements of the statutory requirement to be a worker. SAIF argues, however, that remuneration must be a part of the agreement between employer and claimant for claimant to have been a worker. Antithetically, claimant contends that an entitlement to remuneration here, by way of the minimum wage law, is sufficient to satisfy the "for a remuneration" requirement and that the only agreement that must exist between the parties is for the claimant to be put to work.
The parties' disagreement thus centers around what the legislature meant when it said that the services are furnished "for " a remuneration. Although "for" has many definitions, all the potentially relevant definitions connote a similar meaning: that the subject acted with an expected result. See Webster's at 886 (defining "for" as "in order to bring about or further"; "with the purpose or object of"; or "in order to obtain or gain"). The most plausible reading of **717 the statute, therefore, is that a worker is one who satisfies both components of the definition by demonstrating that (1) he or she undertook an obligation to furnish services; and (2) that he or she did so for -with the expected result of-remuneration. Because the expectation of remuneration arises out of the circumstances of the claimant's relationship with an alleged employer, we also conclude that the claimant's expectation of remuneration must reasonable in light of the circumstances.
Noting that the plain text requires an expectation of remuneration, which, as noted, must be reasonable, we turn briefly to the Court of Appeals' opinion and parties' arguments as they pertain to minimum wage law. The Court of Appeals did not engage in our normal statutory interpretation framework; instead, it concluded that the minimum wage law was dispositive of claimant's status as a worker under ORS 656.005(30). That court reasoned that what claimant did for employer was "work" and that, under minimum wage law, a person must be paid for work. Thus, the Court of Appeals concluded, claimant qualified as a worker, because he was entitled to remuneration under an implied-in-law contracts theory. Gadalean , 286 Or. App. at 230, 398 P.3d 503.[3]
We disagree with that approach. Under the implied-in-law theory on which the Court of Appeals relied, a contract implied in law creates an entitlement to remuneration. See Derenco v. Benj. Franklin Fed. Sav. and Loan , 281 Or. 533, 557, 577 P.2d 477, cert. den. , 439 U.S. 1051, 99 S.Ct. 733, 58 L.Ed.2d 712 (1978) (discussing that a contract implied in law is not a contract; " 'it is simply a rule of law that requires restitution to the plaintiff of something that came into defendant's hands but belongs to the plaintiff in some sense' " (quoting Dan B. Dobbs, Remedies § 4.2, 235 (1973))). ORS 656.005(30), however, requires something different than an entitlement to remuneration: By requiring an "engagement to furnish services for a remuneration," it requires a claimant to have **718 acted expecting remuneration. Thus, a contract implied in law, whether by function of the minimum wage law or otherwise, is insufficient, standing alone, to fulfill the statutory requirement that a claimant engaged to furnish services "for a remuneration." The statute's requirement that a claimant have reasonably expected remuneration is at odds with an application of an implied-in-law contract that would make a claimant a "worker" based entirely on an entitlement to remuneration, in the absence of any expectation of that benefit. The Court of Appeals erred in concluding otherwise.
In this court, claimant proposes a variation of the Court of Appeals' construction. He *971 contends that, if an employer is required to remunerate a claimant under the minimum wage law for services that the claimant performed, then the fact that remuneration is required qualifies the claimant as a "worker" because it would fulfill the statutory requirement that the agreement be "for a remuneration." Stated differently, any agreement to provide services for less than required wages under the minimum wage law is reformed by the minimum wage law to include remuneration at the statutorily required rate.
We disagree that minimum wage law operates to convert claimant into a "worker" under ORS 656.005(30).[4] The question is not whether the agreement required remuneration, but whether, in engaging to furnish services, a claimant reasonably expected remuneration.[5]
SAIF therefore is correct that claimant's proposed application of the minimum wage statute would improperly substitute the definition of "employ" under minimum wage law for the legislature's chosen definition of "worker" in the workers' compensation scheme. See generally ORS 653.025 (no employer shall "employ" or agree to employ at wages lower than those required under the statutory scheme);
**719 ORS 653.010(2) ("employ" means to suffer or permit to work). Having resolved any confusion as to the effect of minimum wage law on claimant's status as a worker under ORS 656.005(30), we return to our familiar statutory interpretation framework and examine the context and legislative history of that statute.
The context of ORS 656.005(30) supports our understanding that, to qualify as a worker, a claimant must engage to furnish services reasonably expecting remuneration. Relevant context "includes other provisions of the same statute and other related statutes." PGE , 317 Or. at 611, 859 P.2d 1143. "When the legislature uses different terms in related statutes, we presume that the legislature intended different meanings." State v. Guzek , 322 Or. 245, 265, 906 P.2d 272 (1995). The same rule applies if the legislature used different terms in the same statute. See State v. Keeney , 323 Or. 309, 316, 918 P.2d 419 (1996) (citing State v. Harp , 299 Or. 1, 7 n. 7, 697 P.2d 548 (1985), for principle); see also Jordan v. SAIF, 343 Or. 208, 217, 167 P.3d 451 (2007) ("[The] use of a term in one section and not in another section of the same statute indicates a purposeful omission.").
In the Workers' Compensation Law, the legislature chose to define "employer" as "any person *** who contracts to pay a remuneration for *** the services of any person." ORS 656.005(13)(a). That is, to establish that an employer is subject to the act, the claimant need only demonstrate that, with respect to at least one person, there is a contract for remuneration in exchange for that person's services to the employer. Notably, the legislature's use of "contracts" to define "employer" under ORS 656.005(13) -but not "worker" under ORS 656.005(30) -indicates that the legislature intended the definition of "worker" to require something different from a contract. Although the definition of "worker" in ORS 656.005(30) includes all the requisite elements of a contract-and, as explained below, has long been construed as requiring a contract-the legislature chose to define "worker" with emphasis on the claimant's engagement, i.e. the claimant's taking on of an obligation that meets the statutory requirements. It is thus consistent with that claimant-focused inquiry to interpret the definition of "worker" as requiring a determination of the claimant's reasonable **720 expectations. With that context in mind, we turn to the development of the statute over time.
Prior to the enactment of the Workers' Compensation Law, the employer-employee relationship was defined and used at common law primarily to establish vicarious liability against an employer by a third party. Lex K. Larson, 7 Larson's Workers' Compensation Law §§ 60.01, 60.04 (Matthew Bender rev.
*972 ed., 2018). Because liability was being imposed on the employer for the actions of its agent, the inquiry focused on the principal.[6] Whether an agent was an employee (and the employer subject to vicarious liability) was thus determined by "the principal's control of, or right to control, the agent's conduct." Eads v. Borman , 351 Or. 729, 738, 277 P.3d 503 (2012) ; Schaff v. Ray's Land & Sea Food Co., Inc. , 334 Or. 94, 99-100, 45 P.3d 936 (2002).
In enacting the Workers' Compensation Law, the legislature expanded on the common-law definition of "employ" to bring a claim within the scope of the act, requiring evidence of the elements of a contract as well as requiring a right to control. ORS 656.005(30) ; see also Vient v. State Indus. Acc. Commission , 123 Or. 334, 335-36, 262 P. 250 (1927) (noting that the relationship between an employer and employee under workers' compensation "originates wholly in contract"). The legislature also made workers' compensation the exclusive remedy for workers, abolishing the common-law remedies that workers could pursue against employers for workplace injuries in favor of a system of no-fault insurance that more sustainably distributes losses. ORS 656.012 ; see Smothers v. Gresham Transfer, Inc ., 332 Or. 83, 125-26, 23 P.3d 333 (2001) (discussing the substitution of workers' compensation as the exclusive remedy for workplace injuries in place of common-law causes of actions), overruled on other grounds by Horton v. Oregon Health and Science University , 359 Or. 168, 376 P.3d 998 (2016). By statute, an employee who is a subject worker does not have common-law claims against the employer. The employee has only **721 workers' compensation insurance benefits, and those benefits are statutorily capped. See Smothers , 332 Or. at 125, 23 P.3d 333 ; see also Clarke v. Oregon Health Sciences University , 343 Or. 581, 616-17, 175 P.3d 418 (2007) (Balmer, J., concurring) (discussing Smothers and the limitations on recovery that are exchanged for a no-fault system). In light of that consequence, and because it is the worker who is affected, it is likely that the legislature intended that the applicability of the Workers' Compensation Law depend, in part, on the worker's agreement and expectations.
Following adoption of the Workers' Compensation Law, the legislature made several amendments, which provide some insight into the legislature's intended meaning of ORS 656.005(30). Prior to 1959, the Workers' Compensation Law provided that a worker was one who "engages to furnish his services, subject to the direction and control of an employer." Former ORS 656.002(15) (1957).[7] In 1959, the legislature added to that definition the phrase, "for a remuneration." Former ORS 656.002(16) (1959). Although we have found nothing in the legislative history that explains that amendment, we understand it as intended to further codify the legislature's chosen standard by which workers' compensation is imposed on a worker. Employees are subject to the act if they take on an obligation to furnish services "for a remuneration."[8]
Our analysis of the text and context ultimately leads us to conclude that a variety of scenarios could implicate ORS 656.005(30). For example, a claimant may take on an obligation to provide services having expressly *973 agreed with the **722 employer that he or she will do so for a remuneration, with the result that the claimant would have a reasonable expectation of remuneration. Or, a claimant may take on an obligation to furnish services, but there may be silence between the employer and claimant as to whether the services will be remunerated, which poses the question whether the claimant could prove any reasonable expectation of remuneration based on the circumstances. As explained below, however, when the record demonstrates that an employer has agreed that a claimant will provide services, but also has told the claimant that there will be no remuneration, the claimant cannot have reasonably expected a remuneration and, thus, does not qualify as a "worker."
APPLICATION
Returning to this case, the board found that employer had told claimant that he would not be paid for the pre-employment drive test and discredited claimant's assertion that he would be paid 25 percent of the gross profit for the delivery. As the board stated, "[T]he record only establishes that claimant had a possibility of employment dependent on whether he passed the safe driving test, which he did not." Because the board found, based off the ALJ's determination, that claimant had been told by employer that he was to perform the test and to do so without remuneration, claimant did not qualify as a "worker" under ORS 656.005(30) for the purpose of the Workers' Compensation Law.
The decision of the Court of Appeals is reversed. The order of the Workers' Compensation Board is affirmed.

Van Hyning testified (and SAIF argues on review) that federal rules promulgated by the federal DOT require the safe driving test to occur before a driver can be hired.

The ALJ's findings of fact did not state whether Van Hyning had been asked about claimant's charge that he would be paid a percentage of the profit for the delivery.

In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct. Larisa's Home Care, LLC v. Nichols-Shields , 362 Or. 115, 129 n. 5, 404 P.3d 912 (2017). This court has explained that a contract implied in fact arises "where the natural and just interpretation of the acts of the parties warrants such [a] conclusion." Owen v. Bradley , 231 Or. 94, 103, 371 P.2d 966 (1962).

We need not-and do not-decide whether claimant was entitled to minimum wage.

In light of our conclusion, explained below, that claimant did not prove a reasonable expectation of remuneration, we do not decide today whether-once a claimant has taken on an obligation to provide services for a remuneration-an injury sustained prior to the start of the remunerable duties might be compensable.

The Restatement (Second) of Agency notes that, for liability to be imposed, a servant need not know the identity of the principal, so long as the principal "consent[s] to receive the service and has the power of direction over the servant's conduct to the same extent" as if the principal's identity were known to the servant. § 220-224 (1958).

In 1959, ORS 656.002(15) (1957) was amended by Oregon Laws 1959, chapter 448, section 1, to become ORS 656.002(16) (1959). The statute was subsequently renumbered as ORS 656.005 in 1975 and then again amended by Oregon Laws 1977, chapter 804, section 1.

When compared to other amendments to ORS 656.005(30), it is evident that the 1959 amendment narrowed the circumstances in which a claimant could be a worker. For example, in 1967, the legislature amended the statute to "includ[e] minors whether lawfully or unlawfully employed." Former ORS 656.002(21) (1967). In doing so, the legislature broadened the scope of employees who could potentially be "workers" without altering the requisite relationship that must exist between employer and employee for an employee to qualify as a "worker." By contrast, by adding the phrase "for a remuneration," the legislature narrowed the nature of the relationship.