Argued and submitted May 31, 2018; supplemental judgment reversed in part, otherwise affirmed December 11, 2019; appellant's amended petition for reconsideration filed January 24, and respondent's response to petition for reconsideration filed January 30, reconsideration allowed by opinion February 26, 2020
See 302 Or App 528, 461 P3d 1034 (2020)

## MINDFUL INSIGHTS, LLC,
### an Oregon limited liability company,
*Plaintiff-Respondent,*

*v.*

## VERIFYVALID, LLC,
### a Michigan limited liability company,
*Defendant-Appellant,*

*and*

## Paul DOYLE,
### an individual and
### Steve Sprindis, an individual,
*Defendants.*

## Multnomah County Circuit Court
## 14CV11173; A161850

454 P3d 787

Plaintiff filed an action against defendant to recover unpaid consulting fees, alleging separate "claims for relief" in its complaint for (1) breach of a written consulting agreement, which included an attorney-fee provision; (2) breach of an implied contract for its consulting services; and (3) *quantum meruit* based on the benefit that plaintiff conferred. The jury found in defendant's favor on the first issue but for plaintiff on the second and third issues. Thereafter, each party sought its attorney fees—defendant on the ground that it had successfully defended against the claim for breach of a written contract, and plaintiff on the ground that it had prevailed on an implied agreement to the same terms as the written contract, attorney-fee provision included. The trial court ruled that plaintiff was the only prevailing party, awarded plaintiff $260,000 in attorney fees, and denied defendant's attorney-fee request. On appeal, defendant argues that the trial court erred both in denying its request and in awarding attorney fees to plaintiff. *Held*: Plaintiff's separately denominated "claims" for breach of a written contract and breach of an implied-in-fact contract were alternative theories within a single claim for breach of contract, and the trial court correctly ruled that plaintiff, not defendant, was the prevailing party on that claim. However, the court erred in awarding plaintiff its attorney fees for prevailing on the implied-in-fact contract theory. The jury expressly rejected the theory that the parties had agreed to the terms of the written consulting agreement, and there was no evidence of any conduct itself from which to infer that the parties had otherwise reached an implied agreement on a term related to attorney fees.

Supplemental judgment reversed in part; otherwise affirmed.

Thomas M. Ryan, Judge.

Sara Kobak argued the cause for appellant. Also on the briefs were Sara C. Cotton and Schwabe, Williamson & Wyatt, P.C.

Amy Heverly argued the cause for respondent. Also on the brief was Jordan Ramis PC.

Before Ortega, Presiding Judge, and Egan, Chief Judge, and Powers, Judge.*

POWERS, J.

Supplemental judgment reversed in part; otherwise affirmed.

_____

* Egan, C. J., *vice* Garrett, J. pro tempore.

**POWERS, J.**

Under Oregon law, the prevailing party on a breach-of-contract claim can recover its attorney fees if the terms of the contract, whether express or implied, authorize the award. ORS 20.077; ORS 20.083; ORS 20.096. The question in this case is how that fee recovery operates when a plaintiff has alleged both an express contract and an implied contract as alternative theories of recovery from a defendant, and a different party prevails on each theory.

Plaintiff, Mindful Insights, LLC, filed this action against defendant, VerifyValid, LLC, to recover unpaid consulting fees, alleging separate "claims for relief" in its complaint for (1) breach of a written consulting agreement, which included an attorney-fee provision; (2) breach of an implied contract for its consulting services; and (3) *quantum meruit* based on the benefit that plaintiff conferred. The jury found in defendant's favor on the first issue but for plaintiff on the second and third issues. Thereafter, each party sought its attorney fees—defendant on the ground that it had successfully defended against the claim for breach of a written contract, and plaintiff on the ground that it had prevailed on an implied agreement to the same terms as the written contract, attorney-fee provision included. The trial court ruled that plaintiff was the only prevailing party, awarded plaintiff $260,000 in attorney fees, and denied defendant's attorney-fee request.

Defendant appeals, arguing that the trial court erred both in denying its request and in awarding attorney fees to plaintiff. For the reasons explained below, we conclude that plaintiff's separately denominated "claims" for breach of a written contract and breach of an implied-in-fact contract were alternative theories within a single claim for breach of contract, and we affirm the trial court's ruling that plaintiff, not defendant, was the prevailing party on that claim for purposes of ORS 20.077, ORS 20.083, and ORS 20.096. We further conclude, however, that the court erred in ruling that the right to attorney fees was part of an implied-in-fact contract between the parties, and we therefore reverse the trial court's attorney-fee award to plaintiff.

BACKGROUND

The relevant background underlying the attorney-fee issues is largely undisputed for purposes of appeal. Plaintiff is a consulting firm specializing in the intersection of technology and banking. Defendant is a company that invented a system for electronic check payments. In July 2013, defendant's chief operating officer, Ted Spooner, reached out to plaintiff's managing member and chief consultant, Edward Woods, and told him that he was now working for defendant; Spooner had previously done consulting work for plaintiff, and he and Woods had previously worked together at an online banking company.

Spooner eventually emailed Woods and requested that he send an "engagement agreement" for plaintiff to perform consulting work for defendant. Spooner then invited Woods and another of plaintiff's consultants, Thomas Brooke, to participate in a conference call along with some of defendant's staff. Following that call, an attorney working for defendant, Thomas Coke, emailed Woods and said that Spooner "wanted me to follow up with regards to an existing contract you have that we might use to engage you with [defendant]." In response, Woods sent Coke plaintiff's "standard" Master Consulting Services Agreement (MCSA).

On October 1, 2013, Coke told Woods, "I'm looking over the contract now, and will let you know if I see anything that stands out." That same day, Coke emailed Spooner, saying, "I think the contract is fine. We can move forward."

Two days later, Woods, Brooke, Coke, and Spooner participated in a conference call in which they discussed the scope of plaintiff's work for defendant. According to Woods, Spooner told him that he was "able to get approval for your doing work" for defendant but with two exceptions—the price would need to be $28,000 for a 30-day term, and Woods and Brooke would have to attend an upcoming trade show called Money 2020. The MCSA was not discussed, nor was it returned to plaintiff.

Thereafter, Brooke and Woods attended the Money 2020 trade show, where they performed work for defendant, including meeting with defendant's president, Paul Doyle,

as well as with defendant's potential clients and business contacts. Following that trade show, Brooke and Woods continued to perform consulting work for defendant.

On October 22, Woods emailed a copy of the MCSA to Spooner, stating, "Attached is the MCSA (exactly the same as previously sent to you and Thomas Coke) and the work order capturing the scope we've discussed and have been working under." The MCSA, as well as an attached project initiation work order, were signed by Woods and included blank spaces for execution by defendant. Spooner replied, "no problem will make sure we turn it around asap." Spooner also forwarded Woods's email to defendant's chief financial officer, Steve Sprindis.

Meanwhile, plaintiff continued performing consulting services for defendant, including sending consultants to defendant's headquarters in Michigan in early November. Over the next few weeks, Woods sent invoices to Spooner and Sprindis in the amount of $46,818.74 that went unpaid. During that time, Spooner assured Woods that "[w]e will pay [plaintiff's] bill that we've approved but I've got to get a handle on what we can do for December and beyond in the next few days."

On December 13, Doyle fired Spooner for acting beyond his authority with regard to engaging plaintiff. Three days later, on December 16, Woods, Brooke, Sprindis, and Doyle participated in a conference call. Doyle expressed dismay at the size of the invoices, explained that he had terminated Spooner for reasons related to plaintiff, and that Doyle was trying to understand what work plaintiff had performed for defendant. Following the call, plaintiff provided defendant with additional documentation for the work that plaintiff had performed, but defendant still did not pay plaintiff.

Eventually, plaintiff filed a complaint that included four claims for relief against defendant: "Breach of Contract"; "Breach of Implied Contract"; "Unjust Enrichment/Quantum Meruit"; and "Fraud."[1] In allegations common to all claims,

---

[1] The complaint also included a request for declaratory relief regarding arbitration, which does not bear on this appeal.

plaintiff alleged that, on October 3, 2013, defendant indicated that it accepted the MCSA and that it would engage defendant on a monthly basis for $28,000 per month while the parties worked out a longer-term scope of engagement. Plaintiff further alleged that defendant twice renewed the engagement, for the months of November and December 2013.

Plaintiff alleged that it rendered approximately 300 hours of consulting services and incurred $4,818.74 in costs and expenses, and that defendant terminated its engagement with plaintiff and reneged on its obligation to pay for the consulting services. The total alleged debt was $88,818.74 for consulting services rendered and costs and expenses incurred.

In its "First Claim for Relief," denominated as "Breach of Contract," plaintiff realleged and incorporated its previous allegations and then alleged that plaintiff "had a contract with [defendant] to provide consulting services," that defendant "materially breached its obligations under the MCSA by failing to pay for services rendered," that plaintiff performed all of its obligations under the MCSA, and that, as a result of the breach, plaintiff was entitled to not less than $88,818.74, "which includes the unpaid balance of the MCSA and [plaintiff's] hard costs that were incurred in connection with the engagement." And, of particular import for this appeal, plaintiff alleged, "The MCSA provides that the prevailing party may recover its reasonable attorneys' fees and costs incurred in arbitrating, litigating, or otherwise resolving any dispute arising out of the MCSA."

In its "Second Claim for Relief," which was denominated "Breach of Implied Contract," plaintiff realleged and incorporated by reference its previous allegations; it then alleged as follows:

"[Defendant] requested that [plaintiff] provide [defendant] with consulting services.

"[Plaintiff] communicated, and [defendant] understood, that it expected to be compensated for the consulting services it provided.

"[Plaintiff] then provided consulting services to [defendant].

"[Defendant] received progress reports and encouraged [plaintiff] to continue to provide consulting services.

"Based on the conduct of the parties, [plaintiff] was to provide consulting services to [defendant] on the condition that these services would be paid for. [Plaintiff] is therefore entitled to recover the reasonable value of the services performed and costs and expenses incurred."

(Paragraph numbering omitted.) The final paragraph of that claim alleged the same amount of damages that was alleged with regard to breach of the express contract: "The reasonable value of the consulting services performed and costs and expenses incurred is not less than $88,818.74."

Plaintiff's third claim for relief was captioned "Quantum Meruit/Unjust Enrichment." After again realleging and incorporating all previous allegations, plaintiff alleged that it had conferred a benefit on defendant by providing the consulting services, defendant had knowledge of the benefit, defendant accepted and retained the benefit, and that it would be inequitable for defendant to keep the benefit without paying for it. Plaintiff alleged that the "value of the benefits conferred" was "not less than $88,818.74."

Plaintiff also alleged an additional claim against defendant and against Doyle and Sprindis for fraud.[2] That claim alleged that defendant, with the authorization of Doyle and Sprindis, falsely represented to plaintiff that it would pay for consulting services when it had no intention of doing so.

Those four claims were tried to a jury, and much of the parties' evidence and their theories at trial revolved around the involvement of Spooner, his authority to bind defendant, and what he communicated to plaintiff. In its closing argument, plaintiff stated that it "had every reason to believe that the chief operating officer [for defendant] was being accurate with us" with regard to whether its contract was approved, even though Spooner's testimony was

---

[2] Doyle and Sprindis are not parties on appeal, and our references to "defendant" throughout are to VerifyValid, LLC.

"a little ambiguous about what exactly he communicated."[3] In describing its theories of recovery to the jury, plaintiff explained that, "even though we have four claims, we're not asking for [$]88,818.74 times four. So all of our claims fall under the same set of facts, which is different legal theories on which [plaintiff] would be entitled to recover those damages."

With regard to the contract-based claims, plaintiff explained that "the first one is breach of express contract. That's the Master Consulting Services Agreement." With respect to that claim, plaintiff told the jury that defendant by "its words and conduct" agreed to the terms that were incorporated into the MCSA.

After further describing the facts supporting its theory that defendant had accepted the terms of the MCSA, plaintiff turned to its second theory, breach of an implied contract:

"So I'll turn next to the breach of implied contract claim. That's a different legal theory that's closely related, that's whether or not the parties agreed to the terms of the Master Consulting Services Agreement, we can infer from the parties' conduct that they were acting together as if they had a contract.

"And when you look at the volume of communications, it's two giant binders. The slides we've seen and the testimony you heard, [defendant and plaintiff] were acting as if they had a contract and [defendant] was requesting work. [Plaintiff] was doing it. [Plaintiff] was repeatedly making clear they expected to be paid and [defendant] promised to pay."

---

[3] Spooner was not called as a witness, but his deposition testimony was played at trial. Spooner testified that he had told plaintiff "[m]ore than once" that he lacked authority to bind defendant; he further testified that, to his knowledge, plaintiff had begun working for defendant without a signed contract "because they trusted me that that agreement would get signed, because I trusted Mr. Doyle that he would negotiate and sign that agreement, because that's what Mr. Doyle told me." He also testified, "I got verbal approval from Paul Doyle for them to do work, pending the negotiation of the Master Services Agreement and terms, and both sides agreed to proceed subject to his approval. *** [T]he contract hadn't been negotiated yet by the time that Money 20/20 arrived, and that work ensued." According to Spooner, Doyle had "intentionally" not executed the contract, as part of a pattern of using the leverage of an unsigned contract to later pressure companies to negotiate better deals.

The jury was subsequently instructed about contracts generally and implied-in-fact contracts in particular. The jury first was instructed: "For a contract to exist, there must be an offer that is accepted," and that "[a]n acceptance is either words, conduct, or both that would reasonably lead the party who made the offer to believe the essential terms of the offer had been agreed to."

Later, the jury received the following written instruction, captioned "Contract Implied in Fact":

"In the alternative to their express contract claim, plaintiff contends, and defendants deny, that there is a contract implied in fact in which defendant agreed to a legally enforceable promise or set of promises with plaintiff.

"A contract implied in fact can arise where the natural and fair interpretation of the acts of the parties leads a reasonable person to conclude that they agreed to the implied contract. The assent and the terms of the parties' agreement may be inferred from the parties' conduct."

The jury ultimately returned a split verdict. It found in defendant's favor on claims for breach of an express contract and fraud. With respect to the former, the jury answered "No" to the question, "Did the MCSA form the terms of an express contract between [plaintiff] and [defendant]?"

The jury also found in plaintiff's favor on the remaining two claims. It answered "Yes" to the question, "Did [defendant] breach an implied contract it had with [plaintiff]?" It then awarded plaintiff $46,818.74 on that claim—essentially, the amount on the invoices sent in November that Spooner said were approved and would be paid. The jury also returned a verdict in plaintiff's favor on the claim for *quantum meruit*. The jury found that the amount of the benefit conferred was $56,000.

In the wake of that split verdict, both parties claimed an entitlement to attorney fees as the prevailing party. Defendant sought to recover fees it incurred defending against the claim for breach of the MCSA, based on a statutory right to recover attorney fees authorized by a

contract even if the defense is "that the prevailing party was not a party to the contract," ORS 20.083. Plaintiff opposed any award to defendant and argued that breach of express contract and breach of a contract implied-in-fact were (contrary to its pleading) alternative ways of proving a single claim for purposes of determining a prevailing party. In plaintiff's view, plaintiff "alleged that [defendant] accepted the terms of the Contract both with its words (express contract) and with its conduct (implied contract)," and the jury simply agreed with the latter theory. For that reason, plaintiff was the prevailing party, and the same terms from the MCSA, which defendant accepted by its conduct, authorized an award of attorney fees to plaintiff.

The trial court agreed with plaintiff, ruling that the express and implied contract claims were "alternative methods of proving the existence of a contract and are not mutually exclusive claims. That the jury found that there was a contract implied in fact and not an express contract does not negate that plaintiff is the prevailing party." The court further concluded that, in addition to the implied-in-fact contract claim, the *quantum meruit* claim "was an alternative theory for recovering the same damages" and that plaintiff was entitled to fees for work performed on that claim as well. The court, after further proceedings related to the reasonableness of the amount requested by plaintiff, entered a supplemental judgment awarding plaintiff $260,000 in attorney fees and $10,251.92 in litigation costs. Defendant appeals from that supplemental judgment.

## ANALYSIS

On appeal, defendant assigns error to the court's denial of its petition for fees for breach of the MCSA and to the award of fees to plaintiff for the implied-in-fact contract and *quantum meruit* claims. Plaintiff defends both rulings, arguing that it alone was entitled to fees under an implied agreement to the fee provision in the MCSA. Those competing arguments present two overarching questions: (1) How is a "prevailing party" determined in the context of a split verdict like this one? (2) What were the terms of the implied-in-fact contract in this case?

## A.  *Express and Implied Contracts*

The answer to both questions turns, in significant part, on the distinction between three related concepts: express contracts, implied-in-fact contracts, and implied-in-law contracts. The first two concepts—express contracts and implied-in-fact contracts—are "no different in legal effect." *Staley v. Taylor*, 165 Or App 256, 262, 994 P2d 1220 (2000) (citing *Restatement (Second) of Contracts* § 4 comment a (1979)). For more than a century, Oregon courts have recognized that the two concepts distinguish between matters of proof, not substance. In *Rose v. Wollenberg*, 36 Or 154, 157, 59 P 190 (1899), the court held that an implied-in-fact contract, "like any other contract, must be founded upon the mutual agreement and intention of the parties." The court explained that the distinction between express and implied-in-fact contracts turned on the "mode of proof":

> "When an agreement consists of words, written or spoken, stating in terms the understanding and obligations of the parties, it is called an 'express contract'; but when it is inferred from the acts or conduct of the parties, instead of their words, it is an 'implied contract.' But in either instance it exists as an obligation solely because the contracting party has willed, under circumstances to which the law attaches the sanction of an obligation, that he shall be bound. And the distinction between an express and implied contract lies, not in the nature of the undertaking, but solely in the mode of proof. In either case there must be an offer of terms, or its equivalent, on the one side, and the acceptance of such terms, or its equivalent, on the other. *** When this intention is expressed, we call the contract an express one. When it is not expressed, it may be inferred, implied, or presumed, from circumstances as really existing, and then the contract, thus ascertained, is called an implied one."

(Internal citation and quotation marks omitted.)

We made the same observation more recently in *Staley*, explaining that the "only difference" between an express contract and an implied-in-fact contract "is the means by which the parties manifest their agreement. In an express contract, the parties manifest their agreement by their words, whether written or spoken. In an

implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct." 165 Or App at 262 (citing *Restatement* § 4 comment a); *accord Gadalean v. SAIF*, 364 Or 707, 717 n 3, 439 P3d 965 (2019) ("In an implied-in-fact contract, the parties' agreement is inferred, in whole or in part, from their conduct. *** This court has explained that a contract implied in fact arises 'where the natural and just interpretation of the acts of the parties warrants such [a] conclusion.' *Owen v. Bradley*, 231 Or 94, 103, 371 P2d 966 (1962).").

In that way, an implied-in-fact contract differs substantially from an implied-in-law contract, also referred to as a "quasi-contract" theory. *See Staley*, 165 Or App at 262 (observing that "[t]he two concepts differ substantially, and the failure to distinguish them has sometimes led to confusion" (citing Arthur Linton Corbin, 1 *Corbin on Contracts* § 19 at 44 (1963)). Unlike an express or implied-in-fact contract, a "'quasi contractual obligation is one that is created by the law for reasons of justice, without any expression of assent,'" and "[t]he category includes a variety of types of contractual obligations that are implied to prevent injustice." *Id.* (quoting 1 *Corbin on Contracts* § 19 at 46).

B.    *Determination of "Prevailing Party"*

With those conceptual differences in mind, we turn to the preliminary question posed on appeal: Who is properly considered a "prevailing party" in the context of this split verdict?

According to defendant, it is entitled to attorney fees under two related statutes, ORS 20.083 and ORS 20.096(1). The former provides:

"A prevailing party in a civil action relating to an express or implied contract is entitled to an award of attorney fees that is authorized by the terms of the contract or by statute, even though the party prevails by reason of a claim or defense asserting that the contract is in whole or part void, a claim or defense asserting that the contract is unenforceable or a claim *or defense asserting that the prevailing party was not a party to the contract*."

ORS 20.083 (emphasis added). ORS 20.096(1), in turn, provides:

> "In any action or suit in which a claim is made based on a contract that specifically provides that attorney fees and costs incurred to enforce the provisions of the contract shall be awarded to one of the parties, the party that prevails on the claim shall be entitled to reasonable attorney fees in addition to costs and disbursements, without regard to whether the prevailing party is the party specified in the contract *and without regard to whether the prevailing party is a party to the contract.*"

(Emphasis added.)

As the emphasized parts of those statutes reflect, both refer to recovery of attorney fees by the "prevailing party." That is where a third statute, ORS 20.077, comes into play. That statute provides, in part:

> "(1)   In any action or suit in which one or more claims are asserted for which an award of attorney fees is either authorized or required, *the prevailing party on each claim shall be determined as provided in this section.* The provisions of this section apply to all proceedings in the action or suit, including arbitration, trial and appeal.

> "(2)   For the purposes of making an award of attorney fees on a claim, *the prevailing party is the party who receives a favorable judgment or arbitration award on the claim.* If more than one claim is made in an action or suit for which an award of attorney fees is either authorized or required, the court or arbitrator shall:

> "(a)   Identify each party that prevails on a claim for which attorney fees could be awarded;

> "(b)   Decide whether to award attorney fees on claims for which the court or arbitrator is authorized to award attorney fees, and the amount of the award;

> "(c)   Decide the amount of the award of attorney fees on claims for which the court or arbitrator is required to award attorney fees; and

> "(d)   Enter a judgment that complies with the requirements of ORS 18.038 and 18.042."

ORS 20.077 (emphases added).

As the text of ORS 20.077 indicates, "'prevailing party' is to be determined on a 'claim-by-claim' basis." *Robert Camel Contracting, Inc. v. Krautscheid*, 205 Or App 498, 504, 134 P3d 1065 (2006). The statute was intended "to specifically clear up the 'confusion'" in defining prevailing party that had resulted from arguably inconsistent appellate decisions, some of which had designated a single prevailing party in the action as a whole, and others of which had identified a prevailing party for each individual claim.[4] *Id.* (quoting Staff Measure Summary, House Committee on Judiciary, HB 2374, Apr 11, 2001; Staff Measure Summary, Senate Committee on Judiciary, HB 2374, May 18, 2001). The legislature opted for the latter, claim-by-claim approach. *Id.*; *see also 16th Group, LLC v. Lynch Mechanical Construction*, 265 Or App 217, 220, 334 P3d 988 (2014) ("[T]o the extent that a claim requires an award of attorney fees, under ORS 20.077(2)(c) the court 'shall' award attorney fees to the 'prevailing party' on that 'claim.'").

In defendant's view, under a claim-by-claim approach, it prevailed on a separate claim for breach of an express contract, even though it lost on the implied-in-fact theory. We disagree. Although those alternative theories were pleaded as separate "claims for relief" in the complaint, they were not distinct "claims." Rather, they involved the same operative facts—that defendant promised to pay for plaintiff's consulting services and failed to do so—and sought the same damages. As described earlier, breach of express contract and breach of implied-in-fact contract are not distinct claims but instead involve alternative ways of proving how the parties manifested their agreement—either orally or in

---

[4] Specifically, prior to the enactment of ORS 20.077, Oregon appellate courts had used both a "net judgment" approach, which yielded one prevailing party in an action involving multiple claims, and a claim-by-claim approach, which could yield multiple prevailing parties in a single action. *Compare Carlson v. Blumenstein*, 293 Or 494, 651 P2d 710 (1982) (netting damages awards on claims and counterclaims in a contractual dispute to determine the "prevailing party"), *with Wilkes v. Zurlinden*, 328 Or 626, 633, 984 P2d 261 (1999) (distinguishing *Carlson* and recognizing the "possibility of more than one prevailing party when there is both a claim and a counterclaim on a contract and each party succeeds in defeating the other party's claim for relief"), *and Newell v. Weston*, 156 Or App 371, 378, 965 P2d 1039 (1998), *rev den*, 329 Or 318 (1999) (holding that "the reference to the 'prevailing party' in ORS 20.096 was intended to mean the party who prevails on claims that are subject to the statute, not the party who prevails on all claims in the action").

writing (express) or through conduct (implied-in-fact). They are no different in legal effect. *Staley*, 165 Or App at 262.

We reached a similar conclusion in *Mount Hood Community College v. Federal Ins. Co.*, 199 Or App 146, 111 P3d 752 (2005). In that case, the plaintiff brought claims for breach of contract and *quantum meruit*. We assumed, for the sake of argument, that the contract contemplated an award of attorney fees on a "claim-by-claim basis," but rejected the defendant's argument that there were actually two separate "claims" for purposes of determining a prevailing party:

> "*** [D]efendants are incorrect that plaintiff's *quantum meruit* claim is a separate 'claim' under the contract for these purposes. Plaintiff sought damages of $59,570.35 on its claim for breach of contract. Plaintiff alleged the same operative facts and sought the same amount—$59,570.35—on its *quantum meruit* claim. Although not captioned as such, plaintiff's *quantum meruit* claim was an alternative theory for recovering the same damages that it claimed under its breach of contract claim. Indeed, the use of a *quantum meruit* claim as an alternative to a breach of contract claim is so common that it is not only unremarkable but something that is expected. As is also common, plaintiff based both its breach of contract claim and its *quantum meruit* claim on the same operative facts. Plaintiff was entitled to plead alternatively on an express contract and in *quantum meruit* without having to elect the theory upon which it would rely. *Kashmir Corp. v. Patterson*, 289 Or 589, 592, 616 P2d 468 (1980); *see also* ORCP 24 A."

199 Or App at 158 (emphasis omitted). Although our analysis in *Mount Hood Community College* was not premised on ORS 20.077, we noted that the outcome would have been no different under that statute. *Id*. at 158 n 6 ("Even if we were to assume that ORS 20.077, as enacted in 2001, *see* Or Laws 2001, ch 417, § 1, applies to this case, our analysis would not be affected.").

The same is true here: Although not captioned as such, plaintiff alleged a single "claim" based on alternative theories of recovery for the same conduct involving a breach of promises about the same services, and for the same amount of damages. *See* ORCP 16 B ("Within each claim alternative theories of recovery shall be identified as

separate counts."); *see also Petersen v. Fielder*, 185 Or App 164, 173, 58 P3d 841 (2002), *rev den*, 335 Or 255 (2003) (concluding that a quasi-contract claim "could more properly have been pleaded as a separate count" but that the error did not change the analysis for purposes of determining the prevailing party). Defendant has not identified, and we are not aware of, anything in the text, context, or history of ORS 20.077 to suggest that the legislature intended to treat alternative theories of recovery under a contract as separate "claims," particularly when more than a century of case law in Oregon has treated them otherwise.[5] We therefore reject defendant's argument that it was a prevailing party; the trial court correctly ruled that plaintiff, not defendant, prevailed on the single breach-of-contract claim.

C.  *The Terms of the Implied-in-Fact Contract*

The remaining issue is whether plaintiff, having prevailed on the contract claim, was entitled to recover its attorney fees. Oregon follows the so-called "American rule" that parties ordinarily bear their own costs of litigation, so plaintiff must prove that a statute or a contract authorizes the recovery of those fees. *See Peace River Seed Co-Op v. Proseeds Marketing*, 355 Or 44, 65, 322 P3d 531 (2014); *Draper v. Mullennex et al*, 225 Or 267, 271, 357 P2d 519 (1960) ("If plaintiff is entitled to a judgment for attorney's fees against a defendant by reason of any special contract

---

[5] Despite the trial court's ruling that ORS 20.077 does not support defendant's entitlement to fees because "it did not prevail in the dispute or as to the contract claim as a whole," defendant's briefing does not cite ORS 20.077, let alone develop an argument as to why claims for breach of an express contract and claims for breach of a contract implied-in-fact should not be treated as a single contract claim. At oral argument, however, defendant contended that the reciprocity provisions in ORS 20.083 and ORS 20.096 were designed to prevent parties from leveraging a nonexistent right to attorney fees to extract settlements in contract disputes, and that treating express and implied-in-fact theories as a single claim would undermine that intent. We disagree. The risk of leveraging a nonexistent right to attorney fees is present regardless of how many theories of contract are alleged based on a single set of facts. For example, a party could assert a single claim for breach of express contract and allege that the agreement included a right to attorney fees. If the plaintiff prevailed on that claim but failed to prove that a right to attorney fees was a term of the contract, the defendant would not somehow become a prevailing party for purposes of ORS 20.077. This situation is not materially different; plaintiff proved that defendant breached its contract but ultimately failed to prove that a right to attorney fees was a term of that contract.

\*\*\* then the right to such recovery should be particularly pleaded and proved."). In this case, plaintiff contended, and the trial court agreed, that the implied contract between the parties authorized the recovery of fees.

The trial court's ruling was premised on the view that the attorney-fee provision in the MCSA was part of the implied-in-fact agreement. The court's letter opinion begins by quoting that provision from the MCSA:

> "The attorney fee provision in the contract between the parties is very broad and provides, in relevant part:
>
> > "'In the event of any dispute arising out of the subject matter of this Consulting Agreement, the prevailing party shall recover, in addition to any other damages assessed, its reasonable fees and costs incurred in arbitrating, litigating, or otherwise settling or resolving such dispute.'"

Although the trial court did not explain the basis for concluding that the parties' implied-in-fact agreement included that fee provision, it presumably agreed with the argument that plaintiff made below and continues to advance on appeal: that "what makes an express contract is the oral or written specific assent to the terms. And [an] implied contract, which can still be reflected in the terms of the MCSA, is accepting it by their conduct." In other words, plaintiff contends that the only difference between its theories of an express contract and an implied-in-fact contract was the manner of acceptance.

As defendant correctly observes, that is not how the case was tried by plaintiff or decided by the jury. First, plaintiff's express contract theory was not limited to acceptance of those terms by signature or words, as opposed to conduct. During closing argument, plaintiff told the jury that "the first one is breach of express contract. That's the Master Consulting Services Agreement." Plaintiff then explained, "They started working on that and [defendant], by its words and conduct makes a—agreed to those terms and those terms were eventually incorporated into the Master Consulting Services Agreement, which Edward Woods had sent two days before in which [defendant] never

disagreed with." That argument was consistent with the jury instructions, which likewise stated that acceptance is either "words, conduct, or both that would reasonably lead the party who made the offer to believe the essential terms of the offer had been agreed to."

At the close of the evidence, plaintiff told the jury that the terms of the "implied-in-fact" theory presented a different question from whether the parties agreed to the terms of the MCSA: "That's a different legal theory that's closely related, that's whether or not the parties agreed to the terms of the Master Consulting Services Agreement, we can infer from the parties' conduct that they were acting together as if they had a contract." Then, when describing the evidence to support that theory, plaintiff made no mention of the MCSA being sent or that the terms of the implied-in-fact contract were the same as the MCSA. Rather, plaintiff pointed to a more limited set of promises around payment and expectation of payment:

> "And when you look at the volume of communications, it's two giant binders. The slides we've seen and the testimony you heard, [defendant] and [plaintiff] were acting as if they had a contract and [defendant] was requesting work. [Plaintiff] was doing it. [Plaintiff] was repeatedly making clear they expected to be paid and [defendant] promised to pay."

The written jury instructions then reiterated that the implied-in-fact contract theory was "[i]n the alternative to their express contract claim"; the instructions were also consistent with the distinction between acceptance of express terms through conduct (an express contract theory) and plaintiff's closing argument on its claim for breach of the express contract, which stated that the terms of the MCSA had been accepted by words and conduct.

And then the verdict form itself reflected the distinction between a contract theory based on the terms of the MCSA (the express contract) and an implied-in-fact contract in which the terms were not expressed but could be inferred from the parties' conduct. Whereas the jury was asked specifically whether "the MCSA form[ed] the terms of an express contract between" the parties, the question

regarding the implied-in-fact contract theory simply referred to "an implied contract" defendant had with plaintiff.

In light of how the case was tried, plaintiff's post-trial explanation—that the jury found an implied contract with the same terms as the MCSA—has no support in the record. The only fair reading of the verdict is that the jury explicitly rejected plaintiff's theory that the parties, through words or conduct, had agreed to the express terms set out in the MCSA, but nonetheless found that it had an implied-in-fact agreement to pay for the invoiced consulting services and plaintiff's expenses.

Because the jury rejected the theory that the parties agreed to the terms of the MCSA, that theory cannot supply a basis for concluding that plaintiff prevailed at trial on such a claim. Moreover, because there is no evidence of any conduct itself from which to infer that the parties otherwise reached an implied agreement on a term related to attorney fees, the trial court erred in awarding plaintiff its attorney fees and litigation costs on that basis.[6] Accordingly, we reverse those parts of the supplemental judgment and otherwise affirm.

Supplemental judgment reversed in part; otherwise affirmed.

---

[6] The trial court's award of attorney fees for time spent on the *quantum meruit* theory was derivative of the entitlement related to the implied-in-fact contract, and plaintiff does not offer any independent justification for awarding those fees. The court also awarded $10,251.92 "in litigation costs and expenses pursuant to the parties' contract" based on the same provision in the MCSA, and we reverse that award as well.